IN THE MATTER OF CHARLES F. HOLDER, JR., JUDGE OF THE MUNICIPAL COURT OF THE BOROUGH OF SEASIDE HEIGHTS, COUNTY OF OCEAN.

Argued October 4, 1977—Decided November 2, 1977.

*Mr. Robert E. Cowen,* designated counsel, argued the cause for The Advisory Committee on Judicial Conduct (*Mr. Richard J. Engelhardt,* on the brief).

*Mr. Richard A. Grossman* argued the cause for respondent (*Messrs. Novin, Farley, Grossman, Liston & York,* attorneys).

The opinion of the court was delivered by

CLIFFORD, J. In keeping with the procedure provided for in *R.* 2:15 *et seq.,* we issued an Order requiring respondent, Judge of the Municipal Court of Seaside Heights, to show cause why he should not be publicly reprimanded.[1] The Order was in response to a Presentment issued by the Supreme Court Advisory Committee on Judicial Conduct. That presentment reads in its entirety (with the exception of the concluding sentence) as follows:

## I *INTRODUCTION*

This matter was brought to the attention of the Advisory Committee on Judicial Conduct by law enforcement officials in Ocean County. The Committee was made aware that several traffic summonses returnable before the Municipal Court for the Borough of Seaside Heights were not set down for hearing and appeared to have been processed contrary to law. After reviewing the records touching upon disposition of the two traffic summonses, and having the benefit of statements signed by many of the individuals who were in a position to relate information concerning their disposition, the Committee caused a complaint to be issued charging the respondent with the improper disposition of two specific traffic summonses and, on other unnamed occasions, additional summonses not specifically known to the Committee.

Respondent's answer to the complaint did not substantially deny the allegations of the complaint, but rather related a procedure utilized by the respondent in disposing of traffic summonses where representations were made to the respondent by "a senior member of

---

[1] The constitutional basis for this Court's disciplinary responsibility in regard to judicial officers, and the corresponding statutory and rule provisions with respect thereto, are discussed at length in *In re Hardt,* 72 *N. J.* 160 (1977); *In re Conda,* 72 *N. J.* 229 (1977); and *In re Yengo,* 72 *N. J.* 425 (1977). While our rules contain no specific procedural mechanism for the imposition of discipline short of removal from office, see *R.* 2:15–14, nevertheless the unchallenged procedure followed here is clearly contemplated. See *In re Conda, supra,* 72 *N. J.* at 233–34; *R.* 2:15–3; *R.* 2:15–12. See also ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 9.1(a) (Tentative Draft, 1972).

the police department." According to the respondent, senior police officials would request dismissals in certain cases, indicate to the respondent in chambers that there was a deficiency in the State's proofs and consent on the part of the issuing police officers that the summonses be dismissed.

Following the receipt of the answer, the Committee ordered the matter set down for hearing. On October 21, 1976, the respondent appeared before the Committee with counsel and fully participated in the hearing, including the offering of witnesses and other evidence, as well as testifying on his own behalf.

## II OUTLINE OF THE EVIDENCE

### A. The Donna Bottari Summons

On May 2, 1975, Police Officer Charles Scalzo issued a motor vehicle summons to Donna Bottari (hereinafter "Bottari") for violation of N. J. S. A. 39:4–81 (Failure to Obey Traffic Signal). The evidence is clear that Bottari discussed the summons with her mother, Theresa Bottari, who thereafter communicated with the Chief of Police for the Borough of Seaside Heights (hereinafter "Chief Groffie"), and conferred with him about the summons. Chief Groffie knew Theresa Bottari for a period of time and had utilized her services as a travel agent in his private life incident to travel arrangements during vacation periods. Chief Groffie called upon Theresa Bottari at her place of employment, obtained from her the summons issued to her daughter, and advised Theresa Bottari that he would "look into the matter."

On June 6, 1975, the respondent dismissed the Bottari summons in his chambers. The respondent never heard the testimony of the issuing police officer or the defendant, nor did he in any other manner adjudicate the case. It is the position of the respondent that at some point in time prior to the dismissal of the summons, the exact date not recalled, Chief Groffie requested a dismissal of the summons. According to the respondent, Chief Groffie advised him that there was either a fatal defect in the State's case or great difficulty in proving the charges; and in requesting that the summons be dismissed he, Chief Groffie, had the consent of the issuing officer.

The testimony of the respondent that he dismissed the summons at the request of the Chief of Police, and then only after first obtaining the above representations from him, is consistent with other evidence before the Committee and a point which the Committee finds factually true. The testimony of the respondent is further supported by the rather unusual activities engaged in by Chief Groffie, including his taking a personal interest in the Bottari summons and in testifying to other related facts before the Committee, which testimony the Committee finds to be, at a minimum, misleading and probably false.

In addition, although Chief Groffie denies any knowledge relevant to the dismissal of the summons (and specifically denies requesting respondent to dismiss the summons), the court clerk, Katherine Goskowsky, testified that she recalled the day that the Bottari summons was dismissed and specifically remembers being requested to bring

the summons to the respondent's chambers, at which time Chief Groffie was present.

Chief Groffie testified that in his position as Chief of Police, he investigated the issuance of the summons by his subordinate police officer and when he concluded that the matter should be adjudicated by the court, he took no further action. He categorically denies having requested the respondent to dismiss the matter and denies that he represented to the respondent that in requesting the dismissal he had the consent of the issuing officer. The Committee attaches no credence whatsoever to the testimony of Chief Groffie.

B. *The Norma Gigliotti Summons*

On December 4, 1974, Police Officer Stanley Matejkowski issued a motor vehicle summons to Norma Gigliotti (hereinafter "Gigliotti") for violating *N. J. S. A.* 39:3-10 (Operating a Motor Vehicle with an Expired Driver's License). Pursuant to Supreme Court Rule 7.7-3, regardless of whether Gigliotti pleaded guilty or not guilty, she was required to appear in court to respond to the charges set forth in the summons. The defendant was notified to appear at the Borough of Seaside Heights Municipal Court with respect to the summons and, some time during December of 1974, did appear at the Municipal Court Building, but never entered the courtroom or appeared in open court.

According to Gigliotti, when she appeared at the Municipal Court building, she was approached outside the courtroom by Chief Groffie, who spoke to her briefly and obtained from her certain information, including an out-of-state driver's license indicating a commencement date subsequent to the date of her alleged offense. Again, according to Gigliotti, Chief Groffie returned shortly and advised her that the matter was disposed of. Gigliotti testified that there was no confusion or doubt in her mind as to the above series of events or the identity of Chief Groffie as the individual with whom she conferred, since she knew who Chief Groffie was and, in fact, lived across the street from him for several years.

The respondent has no recollection of the facts concerning the disposition of the Gigliotti summons except to relate that the disposition by way of dismissal and signature on the summons are in his hand. Again, as with the Bottari summons, he acknowledges that it is probable that he dismissed the matter when court was not in session and without hearing the testimony of any of the parties. The respondent relates that, consistent with his usual procedure, he relied upon a senior police officer who advised him prior to his endorsing the matter for dismissal that the State could not prove or would have great difficulty in proving a case and the issuing police officer consented to a disposition by way of dismissal.

Chief Groffie testified that he has never seen the Gigliotti summons. He denies that he conferred with Gigliotti at the Municipal Court building (contrary to her exact and explicit testimony) and he further denies that he spoke or in any way requested the respondent to dismiss the summons.

C. *Other Summonses, the Specific Identity of Which Are Unknown to the Committee.*

Consistent with the respondent's dismissals of the Bottari and Gigliotti summonses, respondent frankly acknowledges that he has dismissed other summonses in a fashion similar to the procedure under which he testified dismissals were entered in the above two matters. In brief, respondent states that in cases where a senior police officer (often Chief Groffie) represented to him that the trial position of the State was futile or extremely weak and that the issuing officer consented to the matters being disposed of by way of dismissal, he, the respondent, would not require the taking of testimony or any statement on the record by any of the parties or the prosecutor.

### III. FINDINGS AND CONCLUSIONS OF THE COMMITTEE.

Upon a review and consideration of the transcript of the proceedings and the other evidence before it, the Committee has concluded that the method employed in the disposition of the Bottari and Gigliotti summonses were substantially as testified to by the respondent. The Committee specifically finds as a matter of fact beyond a reasonable doubt that in both the Bottari and Gigliotti summonses, as well as those many other summonses unnamed, the respondent entered dismissals only after representations were given to him by a senior member of the police department (specifically, in the cases at bar, Chief Groffie) that the position of the State if the matters went to trial would be hopeless and that the issuing police officer consented to the disposition by way of dismissal.

The Committee attaches no credence whatsoever to the sworn testimony of Chief Groffie that in neither the Bottari or Gigliotti summonses, nor in any other summonses, did he request the respondent to dismiss the matters. In arriving at its view of the testimony of Chief Groffie, the Committee notes the glaring conflicts between the testimony which he gave and the testimony of many of the other witnesses to this matter. The Committee also takes note of the rather unusual interest which Chief Groffie took in the disposition of the Bottari summons and other actions on his part as a senior police officer which are at variance with what he asserts to be his detached interest in the matter.

While the Committee finds that the disposition of the summonses was very much in a manner as testified to by the respondent, it nevertheless is of the opinion that the procedure employed by the respondent was improper and that he is deserving of rebuke for his conduct. Specifically, *R.* 1:2–1 ordains that "all trials, hearings of motions and other applications * * * shall be conducted in open court." One of the obvious reasons for this rule is to prevent fraud on the court which the testimony in this matter has so clearly uncovered. If the State desires to seek a voluntary dismissal of a summons, the proper procedure required to be employed by the rule is the making of an application in open court by the complaining witness or the munici-

pal prosecutor, and setting forth briefly the position of the State with a request for a dismissal.

Although the Committee recognizes that the dismissal procedure mandated by the rule consumes valuable court time and entails some expense in terms of court resources which could better be put to use on contested matters, the utilization of the required method is an effective deterrent to prevent the type of obstruction of justice revealed in this matter. The mandated procedure also insures the public confidence in the open and honest disposition of each and every matter which comes into court — regardless of the political or social associations of the defendants.

The mandate of *R.* 1:2–1 requiring all court proceedings to be carried on in open court is not of recent origin, nor is it subject to ambiguity or exception. The *New Jersey Municipal Court Manual* (1972) stresses in numerous instances the unconditional requirement of the rule that all proceedings, including applications for voluntary dismissal, be conducted in open court. "Police officers involved in pending cases should not confer with the judge in chambers." *Id.* at 66. The manual further states, "If a charge is frivolous or fails to constitute a violation it may later be dismissed by the judge *in open court.*" (Emphasis added) *Id.* at 71.

Failure of the respondent to abide by the strictures of *R.* 1:2–1 permitted Chief Groffie to utilize the court as an instrument for the obstruction of justice. While the committee recognizes that the respondent entered the dismissals with good intentions and for the purpose of alleviating a heavy court calendar, he did so at the cost of laying open the court system to the improper disposition of summonses as evidenced in this matter. The intention of the respondent was good and his motive honorable: however, by failing to abide by the court rule in the name of expedience, he suffered and allowed himself and his court to become the unwitting vehicle by which the improper conduct of another public official was permitted to gain fruition.

While constrained by its official duty to present this matter to the Supreme Court, the Committee believes it should have no permanent taint upon respondent's record. The respondent appeared before the Committee and, although at the time of the impropriety did not realize the unfortunate consequences of his action, now perceives his mistake. He has been frank in his testimony before the Committee and the Committee is satisfied that there will be no reoccurrence. The transgression herein pointed up is a matter which must be recognized and rectified, not only for the constructive criticism of the respondent, but for other members of the judiciary as well.

The Committee finds beyond a reasonable doubt that respondent failed in the above instances to abide by and comply with established law. His conduct has violated Canon 2 of the Code of Judicial Conduct by conveying or permitting others to convey the impression that they are in a position to influence him or his court in the adjudicative process.

## IV. *RECOMMENDATION*

For the reasons assigned, the Committee respectfully presents this matter to the Supreme Court with a recommendation that a complaint be issued to the end that the respondent be publicly reprimanded.

We are in complete accord with the Committee's findings and conclusions and with the reasoning supporting them. Our independent review of the record lends us to adopt them as our own. We repeat the Committee's emphasis on the necessity for observing the mandate of *R.* 1:2–1 that all trials and hearings on motions or other applications be conducted in open court to insure "public confidence in the open and honest disposition of each and every matter which comes into court — regardless of the political or social associations of the defendants."

Likewise do we share the Committee's appraisal of the respondent. He recognizes full well the error of his ways. He has taken the requisite steps to insure compliance with the applicable rules in his courtroom. We are confident that he will not tolerate any repetition, by court personnel or anyone else connected with the Seaside Heights Municipal Court, of the conduct giving rise to these proceedings. While the transgression was a serious one, deserving of public exposure, nevertheless we accord some considerable weight to the Committee's generally favorable evaluation of respondent's co-operative attitude and forthright demeanor, in no wise diminished by his appearance before this Court. This public reprimand should suffice as a constructive criticism of respondent.

We do not, however, entertain quite so indulgent a view of the participation of Chief Groffie in the series of events occupying our attention here. There is no reason apparent from the record before us why his sordid intermeddling in the affairs of the municipal court and, more significantly, his bold-faced effort to deceive both the respondent and our Committee should be countenanced.

At this point we have no jurisdiction to deal directly with the matter. However, the concluding sentence of the Committee's presentment, which, as noted, we excluded from the verbatim recitation above, contains a request that "the conduct of Chief Groffie exposed in this proceeding [be brought] to the attention of appropriate officials of the Borough of Seaside Heights." This opinion should serve that purpose. We would expect that those officials and others concerned with law enforcement in the area would give the matter their immediate and close attention, to the end that this surprisingly long-lingering problem may receive expeditious resolution in the public interest.

*For reprimand*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*Opposed*—None.